FILED
2026 Aug-27 AM 09:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| YOLANDA S. WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-93-GMB |
| | ) | |
| FAIRFIELD BOARD OF EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Yolanda S. Wright brings claims against her employer, the Fairfield Board of Education and the Fairfield City School District (collectively, "the Board"),[1] for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h)(1), and for a violation of her rights under the First Amendment to the United States Constitution. Doc. 6 at 13–15. The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 19. Two motions are pending before the court. The Board has filed a motion for summary judgment. Doc. 38. Wright filed a brief and evidence in opposition to the motion (Doc. 43), and the Board then moved to strike portions of Wright's evidentiary materials.

[1] The Board clarified in its answer that the Fairfield Board of Education and the Fairfield City School District are "one in the same as the Board operates the school district." Doc. 11 at 1. Neither party moved to dismiss the Fairfield City School District even though both have operated as if the Fairfield Board of Education is the sole defendant. *See* Doc. 43 at 1 (listing the Board as the only defendant in the style and body of the response).

Doc. 46. Both motions are fully briefed (Docs. 39, 43, 46, 47, 51 & 52) and ripe for decision.

For the reasons that follow, the motion to strike (Doc. 46) is due to be denied and the motion for summary judgment (Doc. 38) is due to be granted.

## I. MOTION TO STRIKE

In her opposition to summary judgment, Wright relies on (1) an affidavit from a former interim member of the Board, Eric Major; and (2) a declaration she prepared after her deposition. *See* Docs. 43-1 & 43-2. The Board moves to strike portions of both documents. Doc. 46 at 7–13.

### A. The Major Affidavit

When Wright filed suit, she attached Major's affidavit to her *pro se* complaint. Doc. 1-1 at 5. Two months later, she amended her complaint at the court's direction but did not attach the affidavit to the amended pleading. Doc. 6. She nevertheless relies on the affidavit in her response to the motion for summary judgment. *See* Doc. 43-1 at 7–8 (citing Doc. 1-1 at 5).

The Board argues that the court should strike the affidavit either in whole or in part because (1) Wright did not incorporate it into her amended complaint and so it is not properly before the court, and (2) it contains privileged material. Doc. 46 at 7–10; Doc. 52 at 2–6. While the affidavit and its contents have been the source of an evidentiary dispute in this case (*see* Doc. 31), the court rejects the Board's two

arguments for striking it.

First, the Board contends that Wright cannot rely on the Major Affidavit in her opposition because it was not attached to her amended complaint. *See* Doc. 46 at 7 n.7; Doc. 52 at 2–3. Under Federal Rule of Civil Procedure 56, a party opposing summary judgment may rely on an affidavit that is based on personal knowledge, sets out facts that would be admissible in evidence, and shows that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). It is true that an amended complaint supersedes an original complaint and its attached exhibits such that "the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary," *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006) (quoting *Proctor & Gamble Def. Corp. v. Bean*, 146 F.2d 598, 601 n.7 (5th Cir. 1945)), but Rule 56 does not require the party to incorporate a document into her operative pleading for it have evidentiary value at summary judgment.[2] The court will not strike the affidavit for this reason.[3]

The Board alternatively argues that the court should strike portions of the

[2] For that matter, "nothing in the Rule suggests that the affidavits or declarations themselves have to have been produced in discovery in order to be considered in support of or in opposition to a motion for summary judgment." *Benoit v. City of Lake City, Fla.*, 343 F. Supp. 3d 1219, 1224 (M.D. Fla. 2018).

[3] The Board also complains that Wright did not take the additional step of attaching the affidavit to her opposition brief. *See* Doc. 52 at 3 (noting that Wright cites to the inoperative complaint in her brief). This technicality is not a basis for excluding the affidavit.

affidavit protected by the attorney-client privilege. Doc. 46 at 7–10; Doc. 52 at 3–6. Particularly, it claims privilege over the parts of the affidavit that (1) mention Major's motion to table the vote on Wright's nonrenewal after her presentation during the executive session, and (2) the Board's consideration of that motion. *See* Doc. 46 at 7–9; Doc. 52 at 3–6. As the party invoking the privilege, the Board has the burden of proving its applicability. *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003).

The court previously determined that the attorney-client privilege attaches to the executive session after Wright left. Doc. 31 at 6. However, the court did not make factual findings about the precise timing of Wright's departure. *See* Doc. 31 at 10 n.3; Doc. 46 at 8. In its motion to strike, the Board does not point to any evidence that resolves the question whether Wright was in the room during Major's motion or the discussion that followed. *See* Doc. 46 at 8–10; Doc. 52 at 3–5.[4] For this reason, the Board has not met its burden to prove that the attorney client privilege covers the statements in Major's affidavit.

### B. Wright's Post-Deposition Declaration

The Board also moves to strike portions of the declaration Wright prepared

---

[4] Because the motion is not reflected in the minutes of the open session, the Board speculates that it "must have been during the privilege portion of the executive session." Doc. 46 at 9. Knowing that Major made the motion during the executive session, however, does not necessarily mean it was privileged without also knowing when Wright left the room.

after her deposition. Doc. 46 at 10–12; *see* Doc. 43-2. Under the "sham affidavit" rule, a party who "'has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1161 (11th Cir. 2012) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). The court may exclude a plaintiff's affidavit or declaration when it "completely contradicts her deposition" and there is "no way that [the] statements could be read together." *Id.*; *see Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306–07 (11th Cir. 2016). The rule is "applied sparingly because of the harsh effect it may have on a party's case," *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (citation omitted), and courts "must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" *Rodriguez v. Jones Boat Yard, Inc.*, 435 F. App'x 885, 887–88 (11th Cir. 2011) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)).

The Board argues that Wright's deposition and declaration present material inconsistencies about an April 2023 meeting among Thompson, Broadnax, Aikerson, and the Elementary and Secondary School Emergency Relief ("ESSER") processors. *See* Doc. 46 at 10–13; Doc. 52 at 6–9. In her declaration, Wright claims

she conducted a review of ESSER spending with Aikerson in March and April and they later briefed Thompson and Broadnax "on the discrepancies [they] uncovered."[5] Doc. 43-2 at 1. During this meeting, Aikerson mentioned that ESSER spending should comply with the grant's regulations. Doc. 43-2 at 1.

This declaration does not directly contradict Wright's testimony about the same meeting. *See* Doc. 40-1 at 79–80. Wright testified in her deposition that "a lot of attention was being placed on ESSER" around this time, so Thompson asked questions about ESSER funding and budgets during the meeting. Doc. 40-1 at 79–80. Much like her declaration, Wright's deposition testimony did not specify what was said during the meeting or identify Thompson's questions or her answers. *Compare* Doc. 40-1 at 79–80, *with* Doc. 43-2 at 1. For that reason, Wright's declaration and deposition can be harmonized such that the declaration does not fall within the scope of the sham affidavit rule.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no

[5] The Board emphasizes the preceding paragraph of the declaration in which Wright states that she raised certain concerns to Broadnax in the spring of 2023 about the ESSER funds. Doc. 43-2 at 1. Wright does not claim that these concerns matched what she later discovered with Aikerson in April or that she specifically raised them when she met with Thompson and Broadnax. *See* Doc. 43-2 at 1. Although she later argues this point in her opposition brief (*see* Doc. 43-1 at 13), this argument is unsupported in the record and immaterial to summary judgment.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or

is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## B. Relevant Facts[6]

The Fairfield City School District hired Wright as an administrative assistant in July 2020. Doc. 40-1 at 24. The Board operates the school district, makes personnel decisions, and sets and approves salaries for each employee. Doc. 40-5 at 9–10; Doc. 40-7 at 7–8; *see* Doc. 40-1 at 201–04; Doc. 40-7 at 29; Doc. 40-1 at 107–08. Beginning in April 2021, Wright worked at the Board's Central Office and reported to the Director of Teaching and Learning, Dr. LaRhonda Aikerson. Doc. 40-1 at 24–25, 167. Aikerson "had several budgets she was responsible for," and Wright "would assist her with those" by processing purchase orders and invoices. Doc. 40-1 at 25–26.

Aikerson also served as the "monitor" for the Board's ESSER grant. Doc. 40-1 at 25; Doc. 40-6 at 8. The United States Department of Education issues ESSER grants to "state educational agenc[ies] with an approved application" under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. No. 116–136, 134 Stat. 566 at § 18003 (2020). Under the CARES Act, a state department of education allocates ESSER funds "as subgrants to local education agencies," or "LEAs." *Id.* The LEAs can use the funds to (1) improve and develop coordinated responses to prepare for or respond to the coronavirus, (2) provide resources for

---

[6] Wright does not dispute most of the facts in the Board's motion. Doc. 39 at 2–14; Doc. 43–1 at 3. To the extent the parties disagree about the material facts, the court notes those disputes below.

school leaders to address the needs of their schools, (3) train staff on sanitation and purchase cleaning supplies, or (4) any "other activit[y] . . . necessary to maintain the operation of and continuity of services" during the pandemic. *Id.*; *see* Doc. 40-1 at 227.

Wright, as one of the Board's four ESSER "processors," assisted Aikerson with the administration of the grant. Doc. 40-1 at 27–28, 79. With the Board's approval, ESSER processors received a $2,500 stipend twice per year. Doc. 40-1 at 79, 202. In December 2021, the Board moved Wright to a Payroll Bookkeeper position, but she continued to assist Aikerson with the ESSER grant as needed. Doc. 40-1 at 25–28, 31.

***1. Payroll Bookkeeper***

In her new position, Wright worked in the school's finance department and reported to Chief School Finance Officer ("CSFO") Victoria Broadnax. Doc 40-4 at 8; Doc. 40-5 at 13. Broadnax was the head of the finance department and she reported to the superintendent for the district, Dr. Regina Thompson. Doc. 40-1 at 30, 35; Doc. 40-5 at 5.

Wright also managed the employee payment process from "start to finish." Doc. 40-1 at 31. She gathered each employee's information, ensured the employee's hours and absences had been documented correctly, and processed direct deposits. *See* Doc. 40-1 at 31–33. Wright also confirmed that each employee's pay matched

the Board's salary scale. Doc. 40-1 at 33–34. Although the human resources department verified the employee's level of education or certification, Wright made sure the salary aligned with the verified credentials. Doc. 40-1 at 43. Wright generally did not track which fund sources paid each employee, but she made changes to funding sources at Broadnax's direction. *See* Doc. 40-1 at 32–34. In addition to processing salary payments, Wright also issued stipends to employees. *See* Doc. 40-1 at 66–67.

***2. Payroll Irregularities***

Early on in her employment, Wright noticed some irregularities in employee pay. *See, e.g.*, Doc. 40-1 at 36–38. In particular, she believed that (1) several employees were receiving "master's pay" without a verified master's degree; (2) Thompson and Broadnax increased the salaries for certain employees, including Thompson herself, without Board approval; (3) Thompson did not take leave when she missed work for surgeries in the fall of 2021 and 2022; and (4) some employees received excessive pay out of ESSER funds. *See* Doc. 40-1 at 36–38, 40–44, 51, 79–80, 82; *see also* Doc. 40-1 at 171, 197–200.

**a. Master's Pay and Salary Increases**

Around September 2022, Wright notified Broadnax, Thompson, and Human Resources Director Zenobia Odoms that some teachers and administrators who did not have a master's degree or a valid certification had higher salaries corresponding

with that degree or certification. *See* Doc. 40-1 at 36–38, 44. Wright emailed Odoms and asked her to provide documentation of these employees' credentials. *See* Doc. 40-1 at 43, 169. Wright explained that "several employees were asking her questions" about their pay and she needed to be able to "answer them correctly." Doc. 40-1 at 43, 169–170. But Odoms denied Wright's request for more information, and Thompson explained that the Board relies on the degree listed on the employees' resumes to set their salaries until the State of Alabama completes a verification process.[7] Doc. 40-1 at 44, 51, 170.

Later that fall, Thompson asked Wright to process a 4% salary increase for her administrators. Doc. 40-1 at 80. Wright requested documentation that the Board approved the raise, but Thompson and Broadnax did not provide any, so Wright did not process the raise.[8] Doc. 40-1 at 80–81. A few months later, Broadnax told Wright that Thompson received a favorable annual evaluation and would be receiving a raise. Doc. 40-1 at 40–41. Again, Wright refused to input the pay increase without documentation of board approval. Doc. 40-1 at 41.

[7] Wright believed this policy did not comply with state guidelines, so she emailed Beverly Thomas at the State Department of Education to ask for verification that these employees had master's degrees. *See* Doc. 40-1 at 64–65, 190.

[8] Wright believes that Broadnax processed the salary increases for the administrators after she refused. Doc. 40-1 at 80–81.

**b. Thompson's Leave**

On two different occasions, Walter Curry, the Director of Operations, served as Interim Superintendent of the school district while Thompson was out of the office after surgeries. Doc. 40-1 at 41–42, 45, 94, 171; *see* Doc. 40-5 at 35. Since Curry received a stipend for this role, Wright thought Thompson should have to use sick leave during her absences. *See* Doc. 40-1 at 41, 45. Wright mentioned this to Broadnax, and the next day Thompson emailed Wright to explain that she had participated in meetings and worked from home after her medical procedures.[9] Doc. 40-1 at 41, 45, 171. She told Wright to follow Broadnax's directions on her pay and absences. *See* Doc. 40-1 at 171.

**c. The ESSER Grant**

In the fall of 2022 and the spring of 2023, Aikerson created a spreadsheet and asked Wright to verify that "these people are the ones . . . being paid out of ESSER." Doc. 40-1 at 42, 82; Doc. 40–6 at 18. Wright discovered some employees were receiving ESSER funds but were not listed on the spreadsheet. Doc. 40-1 at 42. In addition, the spreadsheet indicated that the salary for the school's COVID manager, Jimecio Archie, was $25,000, but Wright found out his actual salary was around $30,000. Doc. 40-1 at 82; *see* Doc. 40-6 at 17. Wright told Aikerson about these

[9] According to Wright, Broadnax and Curry then met with Wright to try and "scare her about minding her own business." Doc. 40-1 at 46.

discrepancies, and Aikerson said she would look into them but cautioned against "saying anything to Thompson because she gets defensive about [] Archie."[10] Doc. 40-1 at 82.

Wright met with Thompson, Broadnax, Aikerson, and the ESSER processors during April 2023.[11] Doc. 40-1 at 79; *see also* Doc. 43-2 at 1. After the meeting, Wright told Aikerson privately that she had discovered that Broadnax, who was one of the four ESSER processors, had posted a $4,500 stipend to her own account. Doc. 40-1 at 79–80, 197. This exceeded the $2,500 stipend the Board approved for ESSER processors. *See* Doc. 40-1 at 79. Aikerson told Wright she was not going to say anything about Broadnax's stipend because "it would come up later."[12] Doc. 40-1 at 79, 197.

### ***3. Wright's Continued Employment***

Thompson, as superintendent, recommends the termination or nonrenewal of personnel and presents her recommendations to the Board for approval. Doc. 40-5

[10] Aikerson claims she learned about Archie's salary during the May 15, 2023, executive session of the Board, and she denies making this comment about Thompson. Doc. 40-6 at 17–18, 28.

[11] According to Wright, "a lot of attention was being placed on ESSER during the month of April," and Thompson asked questions about ESSER funding and budgets during the April meeting. Doc. 40-1 at 79. Aikerson and Wright "briefed" Thompson and Broadnax "on the discrepancies [they] uncovered." Doc. 40-1 at 79, 197. Thompson does not recall this meeting (Doc. 40-5 at 44), and Aikerson denies it occurred. Doc. 40-6 at 19.

[12] Wright also testified that Aikerson said she would deny knowledge of any "improper use of ESSER funds" if anyone ever questioned her about it; Aikerson disputes this testimony. Doc. 43-2 at 2; Doc. 40-6 at 28.

at 9–10. Beginning in March 2023, Thompson, Odoms, and Broadnax met to discuss the status of various employee contracts for the next school year. Doc. 40-4 at 18–19; *see* Doc. 40-5 at 13. Broadnax raised concerns about Wright's ability to respond to constructive criticism and the way she talked to other employees. Doc. 40-4 at 19. Broadnax told Thompson and Odoms she did not believe the Board should renew Wright's contract at the end of the school year. Doc. 40-4 at 19; Doc. 40-5 at 34. She later conducted a review of Wright's performance in which she scored Wright as "excellent" in multiple categories but "unsatisfactory" in accepting constructive feedback. Doc. 40-1 at 60, 184; Doc. 40-4 at 31–33.

Relying on Broadnax's concerns, Thompson formally submitted her recommendation not to renew Wright's employment, and the Board placed this recommendation on its agenda for a meeting on May 15, 2023. Doc. 40-5 at 13, 119–127, 129. The agenda contained 45 personnel items in total, ten of which were recommendations for nonrenewal, and the Board placed these items on its consent agenda, allowing it to vote "yes" or "no" on all 45 recommendations at one time. Doc. 40-5 at 24, 123–27; Doc. 40-5 at 10.

#### *4. Wright's Discipline and Grievance*

In the days leading up to the May 2023 meeting, Wright attended a compliance training session hosted by the State of Alabama. Doc. 40-1 at 66. After the training session, she noticed that an employee named Marcus Jones was receiving payments

through payroll, accounts payable, and an athletic stipend. Doc. 40-1 at 66, 191. Wright believed this was inappropriate based on her compliance training so she emailed Broadnax, Curry, and Odoms to tell them Jones was "double dipping" and she did not "feel comfortable issuing an additional check nor back pay" to him.[13] Doc. 40-1 at 66–67, 191. Broadnax explained that Jones was not double dipping[14] and then issued formal discipline to Wright for sending an email to the directors divulging sensitive, personal, and unverified information about an employee. Doc. 40-1 at 68–69, 192; Doc. 40-4 at 22, 29–30. In response, Wright filed an Employee Grievance Form with Odoms complaining that she was "being subjected to harassment while . . . doing [her] job." Doc. 40-1 at 70, 194.

### 5. *Presentation to the Board*

Wright contacted the Board's president, Randall Smith, because "things were . . . mounting up against her" and her superiors were "making [her] feel like [she] was doing something wrong by asking for documentation." Doc. 40-1 at 70–71. According to Wright, she was only trying to pay the employees correctly, but her

---

[13] Wright testified that Jones also was "one of the ones being paid through ESSER funds that was not earmarked to be paid through ESSER funds based upon [Aikerson's] spreadsheets," but she did not mention this in her email. Doc. 40-1 at 66, 191.

[14] Broadnax explained that Jones was receiving a payment out of accounts payable on behalf of Ballers Flooring, who "did the floors or spray[ed] the building." Doc. 40-1 at 67, 191. Wright thought that he could have been working for Ballers Flooring at the same time he was supposed to be on the clock as a school employee, but she admits she had no way of knowing whether that was true. Doc. 40-1 at 67–68.

superiors wanted her "to do things that [she felt] are unethical" and contrary to her compliance training. Doc. 40-1 at 70. Wright told Smith that Thompson had received an unapproved raise, some teachers "are being paid what they're not supposed to be paid," and she planned to tell the State Department of Education what she had learned. Doc. 40-1 at 71; Doc. 40-7 at 14. Smith asked Wright to raise her concerns at the next board meeting. Doc. 40-1 at 72; Doc. 40-7 at 15. Unbeknownst to Smith and Wright,[15] the Board would be voting on Thompson's recommendation not to renew Wright's employment at the same meeting. *See* Doc. 40-1 at 63; Doc. 40-7 at 17–18.

Wright attended the May 2023 meeting and presented her "Bad Business Report" during the Board's executive session. Doc. 40-1 at 74–76, 197–200; *see* Doc. 40-7 at 19. The report included a list of the financial irregularities she had discovered:

1. Broadnax "posted a $4,500 stipend payment to her account but the Board had only approved a $2,500 stipend" for ESSER processors.

2. "Dr. Thompson received salary increases without approval."

3. "Dr. Thompson was out of the office . . . and refused to use her leave days . . . even when Mr. Curry was paid $7,500 each time in her absence."

---

[15] Because Wright was being "pick[ed] on," she suspected that she would be on the nonrenewal list. Doc. 40-1 at 85.

4. Thompson and Broadnax gave administrators "an additional salary increase in addition to the 4% State raise without Board approval."

5. Several employees did not have a master's degree or a "valid certification [on file]," but Wright still had to "pay them Master's pay."

6. Broadnax hired a new Accounts Payable Bookkeeper and paid her more than the previous Accounts Payable Bookkeeper while adding "Assistant to CSFO to her title."

7. The "ESSER III Application states [Archie's] starting salary should have been $25,000 a year but he was paid $31,028 and he works 5–10 hours less each week than full time 12 month employees."

8. The certification for one of the school bus drivers expired in December but he "was still driving the bus."

9. "ESSER funds [were] used to pay employees that weren't Board approved or indicated in the ESSER application."

10. Several employees were being paid through Accounts Payable.

11. Marcus Jones was double dipping "per the Compliance Training [she] had received."

Doc. 40-1 at 197–200. As best the court can tell, Wright handed the Board a packet of materials to support her allegations,[16] which included copies of a salary schedule,

[16] According to Wright, Exhibits 20 and 21 to her deposition contain some of the materials she submitted to the Board. Doc. 40-1 at 73–75; *see* Doc. 40-1 at 195; Doc. 40-2 at 28. However, the materials are out of order, some are extraneous, and some are missing. *See* Doc. 40-1 at 73–76.

resumes and personnel files for employees receiving salaries at master's rates, the Board's approval of the stipends for the ESSER processors and Curry, an application for ESSER funds, Thompson's employment contract, and other payroll documents. *See* Doc. 40-1 at 76–78, 197–228; Doc. 40-2 at 1–27. Wright told the Board she was planning to send the packet to the Alabama State Department of Education. Doc. 40-1 at 78; Doc. 40-4 at 37; Doc. 40-5 at 23.

After Wright's presentation, the Board reconvened in open session and voted to approve the consent personnel agenda, which included Wright's nonrenewal. Doc. 40-7 at 26; Doc. 40-5 at 10, 24–25, 127. Wright learned that her employment had been not been renewed the next day. Doc. 40-1 at 85.

## C. Discussion

Wright claims that she engaged in protected activity under both the False Claims Act ("FCA") and the First Amendment by reporting financial irregularities to the Board during the executive session, and that the Board wrongfully terminated her after her presentation. Doc. 6 at 13–15; Doc. 43 at 12–16, 20–23. For the reasons below, however, Wright has not established that she engaged in protected conduct or speech, and both of her claims fail as a matter of law.

### *1. FCA Retaliation*

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C.

§ 3729(a)(1)(A). An FCA claim "arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (internal quotation marks and citation omitted). The anti-retaliation provision of the FCA prohibits employers from terminating an employee for (1) "lawful acts done by the employee . . . in furtherance of an action under the FCA" and (2) "other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). To establish a *prima facie* case under the FCA, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse event; and (3) the adverse event was causally related to the protected conduct. *Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota Ltd. P'ship*, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022) (citing *Little v. United Techs., Carrier Trans. Div.*, 103 F.3d 956, 959 (11th Cir. 1997)).

A plaintiff who claims she engaged in "other efforts" to stop a FCA violation "must at least show that she had an objectively reasonable belief that her employer violated the FCA to establish that she engaged in protected activity."[17] *Simon*, 2022

[17] The Eleventh Circuit has assumed without deciding that the lower "objectively reasonable belief" standard applies to FCA claims instead of the more onerous "distinct possibility" standard following Congress' revision of the retaliation provisions of the FCA in 2009 and 2010. *See Simon*, 2022 WL 3910607, at *6; *Hickman*, 985 F.3d at 1288–90. As in *Simon*, the parties here do not dispute that the lower standard applies, and the court will address whether Wright has shown "that a 'reasonable person' might have thought that a false claim . . . was being conveyed to the government for money." *Simon*, 2022 WL 3910607, at *6–7.

WL 3910607, at *6 (11th Cir. Aug. 31, 2022) (citing *Hickman v. Spirit of Athens Ala., Inc.*, 985 F. 3d 1284, 1289 (11th Cir. 2021)). "[T]he submission of a false claim is the *sine qua non* of a False Claims Act violation," *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) (cleaned up), so an employee bringing an FCA retaliation claim must have reasonably suspected that her employer made a false claim to the federal government. *Hickman*, 985 F.3d at 1289 (citing *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103 (11th Cir. 2020)). General allegations of fraud, noncompliance with governmental regulations, or improper internal procedures are insufficient. *Id.* ("An organization might commit, and its employees might believe it has committed, any number of legal or ethical violations—but the Act's retaliation provision only protects employees where the suspected misdeeds are a violation of the False Claims Act, not just of general principles of ethics and fair dealing.").

Wright predicates her FCA retaliation claim on a "false certification" theory (Doc. 43-1 at 13), under which "a defendant may be found liable for falsely certifying its compliance with applicable laws and regulations." *Ruck*, 963 F.3d at 1103; *Urquilla-Diaz*, 780 F.3d at 1052. The certification of compliance must be both a prerequisite to obtaining a government benefit and a condition for the receipt of funds. *Urquilla-Diaz*, 780 F.3d at 1052. Under this theory also, "mere regulatory violations" do not give rise to a viable FCA claim—only "the false certification of

compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Id.* (citation omitted) (addressing a false-certification claim where a university "improperly [paid] incentive compensation to recruiters" and then "falsely assert[ed] in a yearly letter that it was in compliance with the ban on recruitment-based incentive compensation").

As best the court can tell, Wright alleges that she discovered the Board was not complying with the information listed on its ESSER application and thereby violated the FCA by falsely certifying compliance.[18] *See* Doc. 43-1 at 12–13. In particular, she claims that (1) a section of the ESSER application listed the COVID manager's salary as $25,000; (2) the Board used ESSER funds to pay personnel who were not designated in the ESSER application; and (3) the district was using ESSER funds to pay employees who were not performing ESSER services. Doc. 43-1 at 12–13.

The first problem with Wright's argument is that she does not identify any certification the Board made to the government. *See* Doc. 43-1 at 12–13. To be sure, Wright offers her own unsupported assumption that the Board had to submit such a

[18] Wright does not claim that she suspected the application itself was submitted fraudulently or falsely for the purpose of obtaining federal funds. *See* Doc. 43-1 at 12–13.

certification at some point. *See* Doc. 43-1 at 12–13; Doc. 43-3.[19] But she does not offer any evidence of a specific claim or certification—let alone a false or fraudulent one. Without more, Wright has not shown she had a reasonable belief that the Board violated the FCA.[20] *See Mueller v. Sylacauga Hous. Auth.*, 2022 WL 4538457, at *9 (N.D. Ala. Sept. 28, 2022) (granting defendant's motion for summary judgment where the plaintiffs did not "direct the court to any documents or other evidence showing the defendant made a false statement—or even a potentially false statement—to [the government]"). When the "False Claims Act requires a false claim," *Hickman*, 985 F.3d at 1289, Wright's generalized claims of potential noncompliance with the ESSER grant provisions cannot carry the day. *See id.*; *Urquilla-Diaz*, 780 F.3d at 1052.

Even if Wright could point to a false certification the Board made, she has not shown that she had a reasonable belief that the Board violated the ESSER regulations. Wright does not dispute that the ESSER grant permitted the Board to

[19] To support her claim that the "ESSER funding agreement specifically requires grantees to attest to their comprehensive compliance with the statutory provisions of ESSER" (Doc. 43-1 at 13), Wright relies on the Georgia Department of Education's publicly available "Certification and Agreement for Funding Under [ESSER]." Doc. 43-3. This document states that a state educational agency must submit certain assurances and certifications to receive an ESSER fund allocation, such as a statement that it will ensure its LEAs use ESSER funds for allowable activities. *See* Doc. 43-3 at 5. But Wright does not offer any evidence that the Board had to or ever did submit such a certification to obtain its ESSER funding.

[20] When asked to identify any misrepresentation the Board made to the government, Wright offered only that "ESSER funds were earmarked for certain things and were not used appropriately." Doc. 40-1 at 91.

combine ESSER funds with other sources, so that, for example, it could pay the COVID manager a higher salary than the one listed on the application. Doc. 39 at 8; *see* Doc. 40-1 at 34–35, 82. In addition, Wright has not identified any evidence suggesting the ESSER grant required the Board to list the names of individuals that would be paid with ESSER funds on its application, so she has not shown that it was reasonable for her to believe that it was improper for the Board to pay employees who had not been identified in the application.[21] *See* Doc. 43-1 at 12–13, 197–200. And although Wright claims she believed some employees were being paid ESSER funds without performing any of the services permitted by the grant, she has not developed any evidence supporting that belief.[22] *See* Doc. 43-2 at 1; *see also* Pub. L. No. 116–136, 134 Stat. 566 at § 18003 (listing permissible uses under the ESSER grant). Ultimately, Wright bases most of her contentions solely on Aikerson's spreadsheet and not on an application or certification to obtain ESSER funds or any of the grant's regulations or requirements. *See* Doc. 40-1 at 42, 66, 82–84.

In sum, Wright has not established that she had a reasonable belief that the Board engaged in conduct that violated the FCA. *See Mueller*, 2022 WL 4538457, at *10 ("[A] sincere belief is not the same thing as a reasonable one."). And she

---

[21] In fact, Aikerson testified that the Board did not have to list the names of personnel who were being paid out of ESSER funds in its application. Doc. 40-6 at 11.

[22] If Marcus Jones could have been one of these employees, Wright concedes she had no way of confirming her suspicion. *See* Doc. 40-1 at 67–68.

does not show that her allegations about the Board's misuse of ESSER funds, even if true, involved any false or fraudulent claim or certification to the government. *See Hickman*, 985 F.3d at 1289; *Mueller*, 2022 WL 4538457, at *9. For this reason, Wright has not established the protected conduct element of her *prima facie* case of retaliation under the FCA, so the Board is entitled to summary judgment on this claim.

### *2. First Amendment Retaliation*

The First Amendment prohibits a government employer from discharging a public employee in retaliation for engaging in constitutionally protected speech. *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015). Speech is constitutionally protected when the plaintiff speaks (1) as a citizen and (2) on a matter of public concern. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015). This threshold inquiry is a question of law. *Alves*, 804 F.3d at 1159–60.

To determine whether a plaintiff's speech was made in her capacity as a citizen, rather than as a public employee, courts focus on "whether the speech at issue 'owes its existence to' the employee's professional responsibilities." *Moss*, 782 F.3d at 618 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). But "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech" into employee speech; courts must ask

"whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Lane v. Franks*, 573 U.S. 228, 237 (2014); *King v. Bd. of County Comm.*, 916 F.3d 1339, 1346 (11th Cir. 2019) ("A plaintiff's speech may deserve First Amendment protection even when it concerns her area of employment.").

This inquiry is a practical one turning on "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." *Alves*, 804 F.3d at 1161. Another relevant factor is whether the employee "observ[ed] formal workplace hierarchies" while making the speech. *Fernandez v. Sch. Bd. of Miami-Dade County, Fla.*, 898 F.3d 1324, 1333–34 (11th Cir. 2018). The court should focus on "whether the speech falls within an ordinary duty," and not "whether the speech itself is made ordinarily and regularly." *Id.*; *see Alves*, 804 F.3d at 1163–65 (holding that employees drafted a memorandum detailing their supervisor's conduct "in the course of trying to perform" their ordinary roles and their complaints could not be "reasonably divorced from those responsibilities" even though they were not paid to "rais[e] ethical issues" and the memorandum did not "bear the hallmarks of daily activity").

Wright does not dispute that the contents of her speech owed its existence to her job as a bookkeeper. *See* Doc. 43-1 at 20–23. After all, her role required her to make sure that employees correctly documented their absences and received the correct pay (Doc. 40-1 at 31–34), so her claims that Thompson should have taken

leave or that other employees should not have received master's salaries fall squarely within her job duties. *See* Doc. 40-1 at 197–200. Wright contends, however, that her job did not "involve engagement with" or "reporting on payroll practices" to the Board such that she spoke outside of her ordinary duties when she presented her findings during the executive session. Doc. 43-1 at 21. The court disagrees. Wright's job description may not have required her to report directly to the Board, but she made her presentation while "trying to perform" her responsibilities as bookkeeper. *See Alves*, 804 F.3d at 1163. And Wright admits that her role implied a mandatory duty to report concerns about financial misconduct.[23] Doc. 40-1 at 96. She believed that Broadnax and Thompson asked her to process payments that had not been approved by the Board or were against state policy (*see, e.g.*, Doc. 40-1 at 37–38, 41), and she met with the Board's president and presented during the executive session at his recommendation when Broadnax and Thompson ignored

---

[23] Wright argues that her presentation went beyond ordinary complaints about her ability to work and instead painted "a comprehensive narrative of payroll irregularities and noncompliance with federal and state authority," so she must have been speaking as a citizen. Doc. 43-1 at 22–23. This argument is not supported by law. The Eleventh Circuit has explained that speech about conduct that interferes with an employee's job responsibilities can be employee speech, *Alves*, 804 F.3d at 1165, but it is not true that speech addressing the misuse of funds necessarily must be considered citizen speech. *See Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th Cir. 2007) (finding a city clerk spoke as an employee despite specific allegations about the misuse of city money, services, or property).

her concerns.[24] *See* Doc. 40-1 at 70–71; Doc. 40-7 at 17–19; *see Alves*, 804 F.3d at 1164–65 (explaining that implicit in the employees' duty to perform was a "duty to inform . . . those that would appear to have the most need to know and best opportunity to investigate and correct"). Accordingly, the court finds that Wright spoke as an employee such that her speech was not protected by the First Amendment. Because Wright cannot meet this threshold inquiry, the court's analysis ends there. *See Moss*, 782 F.3d at 618.

## III. CONCLUSION

For these reasons, it is ORDERED that the Board's Motion to Strike (Doc. 46) is DENIED. The Board's Motion for Summary Judgment (Doc. 38) is due to be granted, and a separate final order will be entered.

DONE and ORDERED on August 27, 2026.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

[24] Wright argues that she threatened to take her speech public, but she did not take this step until after her termination. *See* Doc. 40-1 at 78, 92. And while the "lack of public dissemination is not alone dispositive," *King v. Board of County Commissioner*, 916 F.3d at 1349, her belated threat to make her speech public does not transform her private speech into citizen speech.